*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MELISSA MARIE RILEY,

   Plaintiff-Appellant,

v

RYAN SCOTT GRAVES,

   Defendant-Appellee.

UNPUBLISHED
April 4, 2024

No. 367366
Lapeer Circuit Court
Family Division
LC No. 17-050872-DS

Before: CAVANAGH, P.J., and JANSEN and MALDONADO, JJ.

PER CURIAM.

   Plaintiff-mother appeals by right the trial court's July 28, 2023 order denying her motion for sole legal custody and to restrict defendant-father's parenting time. The parties' minor child has identified as female since the child was a toddler despite having been born with male anatomy. This litigation arises entirely from the parties' inability to agree on how to approach the child's gender identity. Plaintiff-mother has always deferred to the child's desires regarding gender expression, using the child's preferred name and pronouns and allowing the use of girls' clothing. Defendant-father requires the child to present as masculine during his parenting time and exclusively uses the child's birth name and male pronouns. The child has suffered from serious mental health problems and, despite being only 10 years old at the time the order was entered, the child had already gone to the hospital multiple times due to suicidal ideations; the parties have likewise been unable to agree regarding mental health treatment. The trial court elected to maintain this untenable status quo in the face of a plethora of unrebutted testimony establishing that defendant-father's conduct was actively harming the child. The evidence presented to the trial court in the context of this particular case is clear, and on this record, we can discern no factual basis supporting the trial court's decision. Accordingly, we reverse.

## I. BACKGROUND

### A. CHILD EXPRESSES FEMALE IDENTITY FROM YOUNG AGE

   The minor child was born on August 13, 2012, and the parties agree that the child began expressing a female gender identity as a toddler. The parents began taking the child to a therapist

at the age of four, and the therapist opined that this sort of gender expression at such a young age was normal. In third grade, the child communicated to the teacher a preference to be referred to using a chosen, traditionally female name and to use she/her pronouns. After consulting with plaintiff-mother in a meeting about which defendant-father was unaware, the school decided to respect the child's wishes. Defendant-father subsequently met with the school, and believing plaintiff-mother violated the terms of their joint legal custody arrangement, filed a motion to show cause why plaintiff-mother should not be held in contempt of court. The court, while acknowledging that it was the school that ultimately decided to respect the child's wishes on the matter, concluded that plaintiff-mother violated the custody order, and it ordered that "[d]ecisions regarding the minor child's name and gender are to be discussed with/between both parties."

## B. PLAINTIFF MOVES FOR SOLE LEGAL CUSTODY AND PARENTING TIME RESTRICTIONS

In January 2022, less than a month after being held in contempt of court, plaintiff-mother sought an order granting her sole custody and barring defendant-father from taking actions contradictory to the child's gender identity. Plaintiff-mother asserted that, despite the child adamantly asserting a female identity, defendant father forcibly gave the child a "buzz cut," restricted the child's access to feminine toys and activities, refused to let the child wear feminine clothing, and accused plaintiff-mother of "making [the child] gay" by allowing feminine toys and clothing. At the hearing, defendant-father openly used the child's birth name and referred to the child using male pronouns. Defendant-father expressed concern regarding allowing a transition at such a young age and hoped that the child's counseling with Danielle McIlrath, which began six weeks prior, would eventually help resolve the issue. The court declined to revisit the custody arrangement because plaintiff-mother did not meet her burden to show proper cause or change of circumstances, and the court determined that the parties would decide amongst themselves whether defendant-father could alter the child's appearance during his parenting time.

## C. THE CHILD'S MENTAL HEALTH DETERIORATES AND PLAINTIFF-MOTHER AGAIN SEEKS FULL LEGAL CUSTODY

The child continued to undergo counseling with McIlrath, and while plaintiff-mother attended each session, defendant-father only attended the first one. McIlrath diagnosed the child with "Gender Dysphoria," which she explained in a letter to be correlated with an increased risk of suicidal behavior, and the risk of such behavior increases with age due to "non-acceptance of gender-variant behavior by others." The child went to the hospital for suicidal behavior for the first time on November 11, 2022, after the child allegedly told plaintiff-mother, "If I have to go to dad's, I will kill myself." The doctor made the following notes:[1]

> This is a 10-year-old male who identifies himself as female who splits time between mother and father. The father is having issues with acceptance of his gender identity issues and [the child] states that as her father always cuts her hair

---

[1] The doctor was inconsistent with usage of gender-specific pronouns.

short and she would like to grow it longer. She had made statements that she would rather die than to go to her father's house who will cut her hair.

She is not acting suicidal. She has no overt plan. She does have a therapist, but needs further intensive treatment. . . .

They are discharged and spoke to together in the room. [The child] is not currently acting suicidal and she does not want to harm herself. She just wants to not have her hair cut.

In psychiatric intake notes taken during that visit, Jennifer Edwards, LMSW, indicated that the child reported to her that defendant-father "doesn't like" the child's gender identify and mockingly refers to the child as "twinkle toes" when the child dances.

On November 17, 2022, shortly after the first hospital visit, a suicidal behavior reporting form was filled out by Stacey Stiles-Glowacki, a social worker at the child's school. The child reported sadness to Stiles-Glowacki and was "feeling like she wants to hurt herself." The child also reported that the negative feelings "are stemming from family dynamic situation outside of school." The child did not report having "a specific plan," but the child did have "thoughts of what she could do," such as stabbing herself "with kitchen knives." Stiles-Glowacki filled out another form on December 1, 2022. The child had reported "feeling really mad and sad" ever since the November hospital visit and reported that the "thoughts of suicide started coming back" that day. While there still was no specific plan, the child reported having "had thoughts of stabbing her heart with a pencil" and "of cutting herself in the neck with scissors." On April 19, 2023, a form was filled out by Briana Overholt after the child reported "having thoughts of committing suicide." The child had communicated romantic feelings to a crush, and when the feelings were not reciprocated, the child "looked at her scissors on her desk and thought 'what would happen if I stabbed myself with the scissors.' "

On April 4, 2023, the child underwent a psychotherapy intake session with Alison June Clinton, MSW, and Clinton completed an intake assessment on April 16. According to Clinton, the child was "seeking assistance with puberty delay," and the child's goal was not to "be as mad on the inside as much" and for defendant-father to "let me be a girl at his house again." Defendant-father said his goal was to "find some mental stability for my son" while plaintiff-mother said, "I really just want [the child] to live authentically." The child reported to Clinton having desired to wear dresses since age three and having come out as transgender a year prior. Regarding puberty,

[The child] reports that she has started getting zits on her face and has started getting more hair on her legs. [The child] reports that she doesn't want her privates to get larger, to have more body hair, and to have a deeper voice. The child reports that she would like to have breast development.

The child listed the following sources of dysphoria: "being forced to cut her hair, being misgendered, being deadnamed, the idea of going through a boy puberty."

Clinton asked both parents to explain the child's gender history. Defendant-father reported that plaintiff-mother began letting the child wear dresses before the age of two, which was upsetting to him because "a 1.5 year old doesn't know what they want." Per the parents'

agreement, the child wore masculine clothing to school until third grade, at which point the child expressed a desire to go by a feminine name and use she/her pronouns. Defendant-father did not want this, but ultimately agreed to allow the child to use "her affirmed name and pronouns at school as long as it didn't affect her school work." Nevertheless, defendant-father believed that child was too young to choose a different name, he told the child "that it is not ok [sic] for a child to decide their gender," and he was "not willing to consent to hormone therapy or puberty blockers." Regarding his goals:

> Dad reports that he wants to show [the child] an alternate path. He reports that he wants [the child] to wait until she is an adult before making any decision to transition and does not support a social transition, and especially does not support any medical transition options. When asked if Dad would support [the child] if she chose to pursue medical transition options as an adult, he said that he did not know and would cross that bridge when he got there.

The information plaintiff-mother reported to Clinton was starkly different. According to plaintiff-mother, the child identified as a girl "since she was able to talk." The child "has always told kids at school that she was a girl, but" became insistent approximately three years prior. According to plaintiff-mother, defendant-father did eventually sign the paperwork regarding the school's decision to use the child's preferred name and pronouns, but he "also started forcibly cutting [the child's] hair." Plaintiff-mother was worried about defendant-father's conduct, reporting that "he doesn't realize how rough he is being." Plaintiff-mother feared that allowing the child to go through male puberty would cause an increase in suicidal ideation. Regarding her goals:

> Mom wants [the child] to have the support that she needs to be able to be her authentic self. Mom wants [the child] to not be trapped in a body that makes her miserable. Mom reports that she wants to speak to a lawyer about options for moving toward puberty blockers. Mom reports that she would rather have a living daughter than a dead son.

At the conclusion of the intake, Clinton summarized the child's sense of gender identity and strong desire to take puberty blockers. According to Clinton:

> [The child's] mother fully supports [the child's] transition and is supportive of [the child] initiating puberty blockers. [The child's] father does not support [the child's] transition and does not use [the child's] affirmed name or pronouns, does not allow [the child] to present as a girl in his household, and does not believe in trans identity. Dad is not consenting to any transition options, social or medical.

Clinton recommended

> the initiation of hormone blockers, the use of the affirmed name and pronouns in all settings, that the parents affirm and support [the child's] gender identity and expression, that the parent [sic] attend a support group for parents of trans and gender nonconforming youth and engaging in psychotherapy with a gender affirming therapist.

In May of 2023, the suicidal thoughts escalated, and plaintiff-mother again took the child to the emergency room. The notes indicated that "she had thoughts about harming herself which was [sic] worse today," but as of the hospital visit, the child had no active plans to commit suicide. The child reported that the suicidal thoughts were "triggered by her father not being supportive. She noted that her father forcefully cuts her hair and makes her change her clothes to the male attire and plays music that are [sic] offending to her." The social worker who spoke with the child during this visit indicated that defendant-father stopped cutting the child's hair, but he continued to make the child wear masculine clothing and practice writing the child's birth name.

> Pt [patient] admits she feels periods of peace in her father's care but ultimately noted [defendant-father's] inability to accept her increases her self harming thoughts. "I just think sometimes if I died it would be easier for everyone and maybe I could come back as a girl.. [sic] you know reincarnation type stuff."

Ultimately, the child was not hospitalized because "she feels safe to return home in her mother's care." The social worker attempted to call defendant-father, but he did not answer and his voicemail was full.

On May 16, 2023, Overholt completed a form indicating active thoughts of suicide:

> Student came to me and shared that she has been having thoughts of killing herself. She shared that the thoughts have been stronger and she is afraid that she is going to act on it. She shared that she had thoughts of stabbing self with scissors. She also shared that she thinks things would be better is she wasn't alive—spoke of stress being gone and wonderings of being reborn as a girl or life being better if she were in heaven. After speaking with staff she shared that she does not have a plan to kill herself anymore.

On May 26, 2023, the child again reported to the emergency room due to suicidal ideation and this time was hospitalized. Dr. Bernard Biermann reported that "she has had increasing suicidal ideation secondary to conflict with her father" because "father is unaccepting of her gender identity." The child reported "that her father makes her visits uncomfortable by not referring to her by her preferred name, playing 'transphobic songs' around her, forcing her to working [sic] in the garage on cars." The child admitted having previously self-harmed using writing utensils and reported being "unsure if she could keep herself safe" with defendant-father the following weekend. "She states that her thoughts have increased to the point that she has [sic] thinking of taking a knife and cutting herself in an attempt to end her life. She states that she currently wants to end her life." The child wanted to be reincarnated as a girl but if that were not possible, "would rather just not exist." Defendant-father reported being unconcerned about the child self-harming, but he agreed that hospitalization was necessary due to depression and anxiety. The child was admitted to the hospital on May 27 and discharged on June 2.

On June 11, 2023, nine days after the child was discharged, plaintiff-mother again moved for sole legal custody, and she also sought restrictions regarding defendant-father's parenting time as well as orders regarding medical care. Plaintiff-mother submitted that the rapid decline in the child's mental health constituted proper cause or a change of circumstances warranting revisiting of custody. Accordingly, plaintiff-mother requested that she be granted full legal custody, that

defendant-father's parenting time be suspended, and that defendant-father be given supervised parenting time until the child's mental health is stabilized. On June 20, the court denied plaintiff-mother's request to suspend defendant-father's parenting time pending the court proceedings and ordered the child to undergo a psychological examination.

On July 5, 2023, the child underwent a psychiatric evaluation with Dr. Genevieve Davis. The child reported to Dr. Davis "that this morning she was supposed to go into her father's care for the next week and became acutely suicidal due to ongoing conflict with her father." The child reported that defendant-father refused the child's request to go to the hospital as a result of suicidal ideation, and defendant-father ultimately returned the child to plaintiff-mother's care, who then took the child to the hospital. The child had ideas of using a knife to commit suicide at defendant-father's house because he continued to leave them accessible; plaintiff-mother had locked away any sharp objects.

> She denies any concerns related to her mood when she is not at her father's house. She endorses significant anxiety surrounding the potential to go to her father's house as well as anxiety about thinking her father will try to kidnap her one day, fear that her mother would die (because then she would have to live with her father), and fear that she would try to act on her suicidal thoughts while at his house. She denies any anxieties outside of her father and being at his house.

Plaintiff-mother reported to Dr. Davis that the child had been seeing a therapist but that defendant-father refused to allow the child to see a psychiatrist. Dr. Davis determined that the child "is not currently required to return to father's home, and has no acute safety concerns when in mother's custody," inpatient care was unneeded. Instead, Dr. Davis recommended a "partial hospitalization program" to assist with coping skills and receive medication.

On July 7, plaintiff-mother filed an emergency motion seeking suspension of defendant-father's parenting time and permission to partake in a partial hospitalization program consistent with Dr. Davis's recommendations. A hearing was conducted on July 18, and defendant-father continued to use the child's birth name as well as male pronouns during the hearing. Defendant-father informed the court that he would not exercise his parenting time for the upcoming weekend against the child's will. Because the custody hearing was scheduled for the following Monday, the court decided not to suspend defendant-father's parenting time.

## D. EVIDENTIARY HEARING

### 1. PLAINTIFF-MOTHER'S TESTIMONY

Plaintiff-mother testified that the child began correcting people regarding gender since approximately age two. For example, "I'd say you're such a good boy. She'd say no, Mama, I'm a girl." Plaintiff-mother disagreed with the notion that she forced a female identity on the child, describing instances in which the child would "sneak into" her closet to wear adult shirts as dresses, and when this behavior was corrected, the child would wear child-sized shirts around the waist as if they were skirts. Plaintiff-mother did not allow the child to decide what to wear until "around three or four" years old. Plaintiff-mother would get both boy and girl toys, but the child was only

interested in the more feminine toys. Plaintiff-mother continued to refer to the child using the masculine name until the child requested a new name at school.

Plaintiff-mother testified about the problems stemming from defendant-father's opposition to the child having long hair. According to plaintiff-mother, she would give the child a "swoopy bang" because "if ever the hair went over the ears, when she went to [defendant-father's] for parenting time it was like, buzzed off, cut off short." There were times when the child had "chunks out of the hair" upon returning to plaintiff-mother, and the child would be "mortified" by and "very upset" about this. Plaintiff-mother discussed this with defendant-father, who said, "I've been cutting his hair his whole life, um, I don't agree with long hair. I'm going to keep on cutting it." Defendant-father was insistent that the child did not have the right to make decisions regarding hairstyle. Plaintiff-mother also described an incident in which the child went swimming with defendant-father, defendant-father insisted that the child wear swim trunks without a shirt, and the child "felt very embarrassed" because "her breasts were showing." The child is always required to change into boys' clothing when at defendant-father's house.

Plaintiff-mother testified in detail about the mental health spiral the child had endured over the previous year. Plaintiff-mother first took the child to the hospital in November 2022 because the child said, "I'd rather kill myself than have to go to" defendant-father's house. Plaintiff-mother contacted the child's primary care provider who referred the child to undergo a psychological evaluation, and this was completed in April 2023. Plaintiff-mother subsequently took the child to the emergency room again because the child said "that she still would rather kill herself" than see defendant-father. The child went to the emergency room again prior to Memorial Day weekend and was hospitalized for six days. Plaintiff-mother then wanted to take the child to a psychiatrist to discuss antidepressant medication, but defendant-father "said that he would not accept any referral for a psychiatrist from U of M. Plaintiff-mother eventually made an appointment with Dr. Schumer to discuss psychiatric medication, defendant-father "did not agree" to this appointment, and the court ultimately had to order that the appointment take place. The child was taken to the hospital again on July 5, prior to a five-day stay with defendant-father, because "she was getting emotional, having a panic attack, feeling suicidal ideation again, saying I can't do it, I can't do it." When defendant-father came to pick the child up, plaintiff-mother and the child went together to tell defendant-father that the child did not want to go to his house and needed to go to the emergency room. The child had "said she was a ten out of ten" which "means that she is at the epitome of the top where she just wants to die." Plaintiff-mother took the child to the hospital, and hospital staff recommended an outpatient treatment plan. Plaintiff-mother attempted to contact defendant-father for his consent, but she was not able to get in touch until the next day; defendant-father "said I will not approve unless it's court ordered."

Plaintiff-mother described a school project in which the children were asked to describe what they would do if they had a time machine. The child's submission was admitted into evidence, and the child said that "she wished she could go forward in time so she wouldn't have to be around her father so that she could be herself." Plaintiff-mother was afraid that defendant-father's parenting would lead to the child committing suicide. She opined that defendant-father did not believe anything she told him about the child's mental health and that defendant-father believes plaintiff-mother is at fault for the child's transgender identity. Plaintiff-mother wanted full legal custody because she did not believe defendant-father was willing to consent to necessary healthcare. Plaintiff-mother wanted defendant-father's parenting time to be suspended because

defendant-father was putting the wellbeing of the child "in harms way." If defendant-father's parenting time was not suspended, plaintiff-mother believed it should be limited to "a therapeutic setting" so that the child would feel safe, be referred to with the child's preferred name and pronouns, and wear feminine clothing.

## 2. EXPERT TESTIMONY

### a. Alison Clinton

Alison Clinton, a clinical social worker, testified both generally about transgender children and specifically regarding this child.[2] Clinton explained the meaning of the term "gender identity":

> So, everyone has an assigned sex at birth. That is when a baby is born, um, we look at that baby's body and make our best guess as to what the baby's gender is going to be and that is the sex assigned at birth. It's put on the birth certificate. But the gender identity is someone's internal sense of who they are, what their gender is. Um, it's internally experienced rather than externally presumed.

Clinton explained that gender identity can present very young, and there are children "who are telling us that their gender identity is different from their assigned sex at birth as soon as they can talk." Gender identity is distinct from gender expression in that gender identity "is your innate sense of who you are" whereas gender expression "is how you present to the world." Clinton explained that "transgender" refers to anyone "whose gender identity and assigned sex at birth are not aligned" whereas "cisgender" refers to people for whom these are aligned.

Clinton agreed that it was common for children to experiment with gender expression without this being indicative of fluidity with respect to their gender identity. Clinton was asked how to distinguish between these two classes of children:

> *Q.* How do you distinguish a child who might be having a phase of gender expression from the child's true gender identity? How do you tell the difference when you're evaluating?
>
> *A.* That's a great question. Um, so we ask the child how they feel about the way that other people perceive them, the way that they see themselves. We ask about how they feel about their bodies. We ask about how they feel about the way

---

[2] Clinton was not formally received as an expert during her testimony. However, this appears to have been an oversight. Clinton detailed her extensive education and training in endocrinology and childhood gender dysphoria. Clinton has a Master of Social Work (MSW) degree and was employed "in the Pediatric Endocrinology and Adolescent Gender Services" department for Michigan medicine. She also described several trainings she went through relating specifically to transgender children. Moreover, the trial court indicated during opening statements that plaintiff-mother planned to present testimony from two "experts." Moreover, during its oral ruling, the trial court referred to plaintiff-mother's witnesses as experts. The trial court treated this as expert testimony, and defendant-father has not disputed her expertise below or on appeal.

their body might develop over time.  Oftentimes if someone is experimenting with gender expression they will be fine with being seen as their assigned sex at birth, being referred to using those pronouns, or their name on their birth certificate.  But they will want to present in a way that is maybe gender non-conforming, but for a child who identifies as a gender that is different from their assigned sex at birth, they will consistently want to be seen as that gender, not simply as more masculine or feminine version of their assigned sex at birth.  They will want often to be referred to using different pronouns, using a different name.  They will often, you know, wish to be treated as their affirmed gender.  So that's generally the big difference.

Clinton explained the term "gender dysphoria," which "is marked by incongruence between ones [sic] gender identity and one's sex assigned at birth and then it's also accompanied by distress at things that remind that person of their assigned sex at birth."  Sources of distress include body parts, fears regarding the trajectory of bodily development, and a persistent desire to be treated as the affirmed gender.  Gender dysphoria does not always accompany being transgender, and it sometimes presents "from a very young age because [the children] recognize that people are positioning them as a gender that they don't internally identify with."  It also commonly presents at puberty because "body changes" cause it to "present really intensely."

After this foundation was laid, Clinton was asked to discuss this child.  Clinton explained that she discussed the matter with the child and parents each separately.  All three agreed that the child began to outwardly take on a female gender identity no later than age three, around when the child began speaking.  Clinton was asked about what the child communicated to her when neither parent was present:

> *Q.* And so from [the child's] perspective did she express a preference as to her gender?
>
> *A.* Yes.
>
> *Q.* And what was that preference?
>
> *A.* Female.
>
> *Q.* And . . . did she express [the female name] as a preference as her name?
>
> *A.* Yes.
>
> *Q.* All right.  In terms of her hopes and wishes for the future, did you get into that conversation with her?
>
> *A.* Yeah, we did.
>
> *Q.* And what are [the child's] hopes for the future?
>
> *A.* Um, she wants to grow up to be a girl, essentially.  Essentially.  She has talked about wanting to go through girl puberty.  She was really excited about

getting boobs. . . . She wanted to have long hair. She was, ah, just wanted to have people be nice to her and you know, just be herself.

       *Q.* Do you feel that these were authentic expressions of her wishes?

       *A.* Yes.

While defendant-father expressed suspicion that plaintiff-mother had been dressing the child in feminine clothing, Clinton did not discern any reason to suspect that the identity was forced on the child by either parent. However, the child "expressed a lot of distress at being forced to wear boy clothes, to have her hair cut short." Defendant-father reported to Clinton that he did not allow the child to present as female in any way at his home. Defendant-father wanted the child to have "an alternate path" and wait until adulthood to transition.

Clinton recommended "supportive therapy," which involved "words of affirmation," validation, and offering support. Clinton was adamantly opposed to any sort of "conversion therapy," which she defined as "the practice of trying to convince a child to identify with their assigned sex at birth." She testified that this practice "is generally considered traumatic"; that it increases the risk of negative mental health outcomes, including suicide; and that it "is considered to be abusive in many circles." Another one of Clinton's recommendations was to use "feminine names and pronouns in all settings." Clinton testified that, when parents refuse to use a child's preferred name and pronouns, "there is evidence that shows that it increases suicidal ideation." Other ways a parent can support a child who is suffering from gender dysphoria include allowing the child to wear preferred clothing, wear preferred hairstyles, and participate in gender affirming activities.

Clinton recommended starting the child on "hormone blockers." She explained that a type of hormone blocker is a "puberty blocker," which "would put a pause on puberty." Another type could suppress testosterone. She recommended hormone blockers because "it could potentially prevent changes that could be very distressing to a child" and "allow a child to have more time to explore their" gender identity. Clinton was not aware of any permanent effects, and she disagreed with defendant-father's contention that such medication would be abusive. Clinton explained that puberty blockers were a short-term treatment designed to allow a child to decide whether to go forward with natural puberty or to later begin "hormone replacement therapy." Clinton emphasized that there was no evidence that puberty blockers cause long term harm but that there was evidence of "long term benefit for pubertal suppression in trans youth." Available research has concluded that the usage of hormone blockers reduces rates of suicide among transgender youth. Clinton testified that it would be highly unusual for a child to determine that they actually are cisgender, but she clarified that help would be available to assist the child with transitioning back to the gender conforming with their birth-assigned sex.

**b. Jane Kessler**

Jane Kessler, who was received as an expert in clinical psychology, had a Master of Arts degree in clinical psychology, was licensed to practice clinical psychology, was in the process of obtaining a PhD, had experience as a clinical psychology professor, and had been practicing since 1996. Kessler defined "gender identity" similar to Clinton, but she also explained that gender

identity is more than just a psychological phenomenon; recent research found that it was also a "biological phenomenon" with "genetic roots."

> What current research tells us is that all this time where we thought that gender identity was a psychological phenomenon, in fact it's a biological phenomenon that has psychological manifestations. For example, when we do genetic studies looking at identical twins reared together, identical twins reared apart, non-identical twins, we see a very strong genetic basis for—for gender identity.

Kessler further explained that "the body produces hormones that are consistent with the individuals [sic] psychological experience of gender." The research has also identified "shifts" in the brain structure of transgender individuals. "[I]t is those hormonal differences that in turn produce the changes in the brain that lead to the experience of self as female."

According to Kessler, gender identity "is present very, very early in life." When asked about the child's tendency to wear plaintiff-mother's clothing as a toddler, Kessler explained that this age is "typically when expressions of gender identity begin, in toddlerhood with preferences about clothing as it signals gender." She opined that a three-year-old child would "[a]bsolutely" be capable of recognizing "that there's a difference between their identity and their assigned gender." Indeed, the earlier nonconforming gender expression begins, the more likely it is to be authentic, and consistency of the expression is another indicator of authenticity. Kessler did not believe it possible to force such a young child to present gender identity a certain way because "[t]oddlers are known for making themselves known and not going along with the program." She noted that children in countries in which a particular gender is considered more desirable are no more likely to present as the more desirable gender.

Kessler acknowledged that "the higher order of brain functions" continue developing well into adulthood, but this is limited to aspects such as reasoning and impulse control; other "aspects of brain development are completed much earlier."

> *Q.* Does what you just explain [sic] to mean that a child wouldn't know his or her true gender identity until they reach that full development?
>
> *A.* No.

Kessler testified that "for the vast majority of individuals gender is not fluid and that once the individual establishes gender identity for themselves psychologically[,] which comes after it's established physically, that that [sic] is their status period."

Regarding gender dysphoria, Kessler testified that this "is the clinical term when an individual experiences their biological sex as being the subject of intense unhappiness and upset." Kessler was asked about how a parent should support a child suffering from this condition:

> *Q.* [W]ould you recommend that . . . parents support their child's preferred pronouns?
>
> *A.* I would, yes.

*Q.* What about the an [sic] assumed or chosen name, would you recommend that they follow a chosen or assumed name?

*A.* Very important, yes.

*Q.* All right. What about letting the child dress or clothe themselves consistent with their preferred gender? Would you recommend that?

*A.* Also very important.

Kessler explained that children learn about "their essential acceptability" from their parents, so "when a parent rejects some essential part of the child," the child will "experience this as a global rejection."

Kessler testified that suicidal ideation is "very much" a concern for transgender children. Research regarding children aged 12 to 18[3] has found that at least 40% have wanted to die or engaged in suicidal actions. With respect to adults, that figure rises up to as high as 60%.

*Q.* [I]f the defendant were to make an argument well, I don't want my child to have this 40 percent risk of suicide so I just don't want my child to be transgender, how would you respond to that?

*A.* The—the risk of suicide does not necessarily accompany an individual being transgender. It doesn't have to accompany an individual being transgender. It accompanies an individual being transgender because of the way they are treated by those around them, and in particular by family members. So, that risk is very modifiable, can be lowered quite dramatically when the family members and others close to the child, and later the young adult, accept them for their experience of themselves.

*Q.* Would it be fair to say that a parent's rejection of a child's gender identity poses a risk of safety to that child?

*A.* A tremendous risk.

Kessler opined that a child should be "very quickly" evaluated at a hospital if the child expresses an intent to self-harm.

Kessler was asked to respond to some of the arguments that defendant-father had raised during the proceedings:

*Q.* [A] statement was made that gender forming care as to age of 10 is tantamount to child abuse. What would your response to that be?

---

[3] No research was available for younger children.

*A.* There is an enormous weight of evidence collected all over the world that that is not correct.

*Q.* What about the statement that administering any sort of hormone blockers or puberty blockers is child abuse?

*A.* Um, there is an enormous weight of evidence collected at medical centers all over the world that that is not correct.

### 3. DEFENDANT-FATHER'S TESTIMONY

Following the close of plaintiff-mother's proofs, defendant-father testified. He was examined by the court and then cross-examined by plaintiff-mother's attorney. During his testimony, defendant-father continued using he/him pronouns and the child's male name. Defendant-father noted that the child's "downward spiral" correlated with the decision to recognize the child's transition at school, and he testified that he wanted the child to have "multiple pathways" in life. He wanted the child to present as male at his home and believed that it would be better if a final decision were made when the child is "old enough to understand." The court noted that the experts testified that defendant-father's approach was detrimental to the child's wellbeing, but defendant-father indicated that he disagreed. Defendant-father described three incidents, apart from the aforementioned hospital trips, in which the child expressed suicidal ideations at school, and plaintiff-mother did not take the child to the hospital. Defendant-father acknowledged that, each time plaintiff-mother did take the child to the hospital, the child reported fear of committing suicide at defendant-father's house, but defendant-father continued to maintain that there were no such issues at his home.

Defendant-father testified that mental health crises never occurred with the child at his home. He explained that the child never corrected him when he used the male name and pronouns and that the child would change into male clothes upon arrival without direction. However, defendant-father acknowledged that he previously had a conversation with the child, shortly after the in-school transition, in which he explained that he did not want the child to present as female at his home. "I'm like we're not wearing girls' clothes here, we're not calling you [your female name] here. And he said that's fine, and we've had that understanding since the name change at school began to happen." Defendant-father was uncertain if he would ever soften this rule, but was adamant that the child was too young. Defendant-father acknowledged that the child was bothered by his refusal to use the female name and pronouns.

The court pressed defendant-father regarding his approach to the child's gender dysphoria, noting that he seemed to be "trying to ignore it." Defendant-father again stated that the child's mental health had deteriorated since the child's name and pronouns were changed at school. Therefore, he believed it would be beneficial "to show him a separate path" when at defendant-father's house. Defendant-father suspected that additional underlying problems were present because the child never expressed a desire to engage in self-harm at defendant-father's home, and he believed the mental health issues were "facilitated at his mother's house." Defendant-father did note that he would not force the child to see him if the child did not want to. Defendant-father did not believe hormone treatments would be helpful, and he opined that it would be "morally

wrong" to allow a child to use hormonal medication at such a young age because the child was too young to "understand the ramifications" of the medication.

Defendant-father explained that such a young child lacked "the cognitive reasoning" to make such a decision, and his opinion was informed by "common sense." He acknowledged that Kessler disagreed with him, but he wrote this off as "a subjective opinion" and believed his opinion was also valid. Defendant-father was unmoved the clinical recommendations for the child made the previous April because they were made "[b]y a social worker," but he admitted that he had not contacted a psychologist for an evaluation and that he did not consent to evaluations with psychological experts at the University of Michigan. He was concerned that "the affiliations with U of M" evidenced "an agenda" to bring the child to a doctor whom he did not support. He also did not consent to "in-depth outpatient therapy" at the New Oakland facility. Defendant-father indicated that he wanted the depression and anxiety medications to be reviewed by the child's primary care provider rather than a psychiatrist. Defendant-father testified that he had not cut the child's hair since the previous October, but he acknowledged that the previous two haircuts he gave were against the child's will because, "I'm not going to have [the child] look like a slob." Defendant-father testified that it was not possible for he and plaintiff-mother to agree on how to approach the child's gender dysphoria.

## 4. THE COURT'S DECISION

The court began by providing an in-depth summary of the evidence. The court, noting that it met with the child in chambers, decided that it would refer to the child using the feminine name and she/her pronouns. The court determined that plaintiff-mother had not met the threshold burden to establish proper cause or change of circumstances because the child's gender dysphoria "is not a new issue." The court acknowledged that the child reported becoming suicidal when faced with the notion of seeing defendant-father, but it reasoned that this was an issue the parties had "been dealing with for years." The court, despite describing itself as "not convinced there's a proper cause, change of circumstances at this point," decided to perform a full best-interests analysis anyway—presumably to facilitate appellate review.

The court found an established custodial environment with both parents then made findings regarding each best interest factor. Regarding the specifically delineated factors, the court's findings fell pretty evenly without any factor strongly favoring either party. The catchall factor proved to be the focal point of the court's analysis, and it used that factor to address the child's gender dysphoria. The court found that defendant-father was not understanding "the big picture" and seemed to be blaming plaintiff-mother for the problems. The court stated that the parents needed "to get closer to a middle ground" and suggested that defendant-father should be a little bit more accepting and work on using she/her pronouns. In general, the court essentially nudged the parties toward figuring out how to work together. The court decided that the parties could hold off on hormonal medication and try to reach an agreement in the future. The court concluded that plaintiff-mother failed to meet her burden and ordered that custody and parenting time remain unchanged. The court then entered a handwritten order providing that the parties would attend a consultation with Dr. Shumer at the University of Michigan; that both parties still need to consent to any medication; that the parties would need to attend six sessions with a psychologist; and that both parties need to continue individual therapy.

This appeal followed.

## II. DISCUSSION

We conclude that the trial court erred by electing to maintain what the evidence clearly established to be an untenable status quo.

## A. STANDARDS OF REVIEW

MCL 722.28 provides that when reviewing a lower court order in a custody dispute, "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." This statute "distinguishes among three types of findings and assigns standards of review to each." *Dailey v Kloenhamer*, 291 Mich App 660, 664; 811 NW2d 501 (2011) (quotation marks and citation omitted). Factual findings "are reviewed under the 'great weight of the evidence' standard." *Id.* "A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction." *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019). "Questions of law are reviewed for clear legal error. A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law." *Id.* (quotation marks and citation omitted). "Discretionary rulings, such as to whom custody is awarded, are reviewed for an abuse of discretion. An abuse of discretion exists when the trial court's decision is palpably and grossly violative of fact and logic." *Dailey*, 291 Mich App at 664-665 (quotation marks, citations, and alteration omitted).

## B. CUSTODY

### 1. PROPER CAUSE OR CHANGE OF CIRCUMSTANCES

To the extent that the trial court found that there was not proper cause or a change of circumstances necessitating a review of the custody arrangement, this finding was against the great weight of the evidence.

Pursuant to MCL 722.27(1)(c), a court may only modify prior custody orders "for proper cause shown or because of change of circumstances . . . ." This requirement "imposes a gatekeeping function" designed to maintain stability in the child's life. *Kuebler v Kuebler*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362488); slip op at 16.

> [T]o establish "proper cause" necessary to revisit a custody order, a movant must prove by a preponderance of the evidence the existence of an appropriate ground for legal action to be taken by the trial court. The appropriate ground(s) should be relevant to at least one of the twelve statutory best interest factors, and must be of such magnitude to have a significant effect on the child's well-being.
>
> * * *
>
> [I]n order to establish a "change of circumstances," a movant must prove that, since the entry of the last custody order, the conditions surrounding custody of the child,

which have or could have a *significant* effect on the child's well-being, have materially changed. . . . [T[he evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child. This too will be a determination made on the basis of the facts of each case, with the relevance of the facts presented being gauged by the statutory best interest factors. [*Vodvarka v Grasmeyer*, 259 Mich App 499, 512-514; 675 NW2d 499 (2003).]

The record is unclear regarding the trial court's position on whether proper cause or change of circumstances necessitating a custody review was established. The court indicated at the close of the evidentiary hearing that it was "not convinced" plaintiff-mother had met her burden. However, this comment notwithstanding, plaintiff-mother maintains that the trial court actually did find that the burden was met because (1) the trial court purportedly did find the burden met at a prior hearing and (2) the trial court proceeded to perform a best-interests analysis anyway. Regardless, the court's statement that it was not convinced plaintiff-mother met this threshold burden was against the great weight of the evidence.

The trial court's finding was premised on its belief that the child's gender dysphoria was not a new issue. The child began expressing a female gender identity at a very young age, and the parties have never agreed regarding how to approach this issue. The trial court's finding that there had not been a material change in circumstances did have support in the record, but it erred by ending the analysis there. A full custody evaluation can also be started with a finding of "proper cause," and the evidence in this case overwhelmingly established that the present arrangement is not working. The child had been taken to the emergency room three times due to suicidal ideation, and suicidal ideation was regularly documented at school. The child's thoughts continued to escalate, and the child was eventually hospitalized for six days. The parents were perpetually unable to agree on how to proceed, with plaintiff-mother advocating for gender-affirming care while defendant-father insisted on providing an "alternate path." It is undeniable from the record that the current arrangement is not working, and this is proper cause.

## 2. ESTABLISHED CUSTODIAL ENVIRONMENT

Plaintiff-mother's contention that the trial court erred by finding an established custodial environment is without merit.

"When resolving important decisions that affect the welfare of the child, the court must first consider whether the proposed change would modify the established custodial environment." *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010).

The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. [MCL 722.27(1)(c).]

"[A] custodial environment can be established in more than one home." *Ritterhaus v Ritterhaus*, 273 Mich App 462, 471; 730 NW2d 262 (2007). "If the proposed change alters the established custodial environment, the party seeking the change must demonstrate by clear and convincing evidence that the change is in the child's best interests." *Marik v Marik*, 325 Mich App 353, 361; 925 NW2d 885 (2018). If an order does not change an established custodial environment, then the applicable standard of proof is a preponderance of the evidence. *Id*.

Plaintiff-mother argues that the court erred by holding her to the clear and convincing evidence standard because there was no established custodial environment with defendant-father. Plaintiff-mother maintains that defendant-father's unwillingness to allow the child to be feminine in his home, taken together with the child's proclivity for vocalizing a desire to self-harm before defendant-father's parenting time, forecloses a finding of an established custodial environment. We conclude that the court's finding had substantial support in the record. Defendant-father had been exercising parenting time every other weekend for the child's entire life. While defendant-father was not supportive of the child's transition, he consistently met other needs when the child was in his care, and the child looked to him for guidance in other facets of life. Therefore, the court's finding was not against the great weight of the evidence.

## 3. BEST INTERESTS AND LEGAL CUSTODY

The trial court made numerous best interest findings that were against the great weight of the evidence, and it abused its discretion by not granting plaintiff-mother sole legal custody of the child.

"A trial court must consider the factors outlined in MCL 722.23 in determining a custody arrangement in the best interests of the children involved." *Bofysil v Bofysil*, 332 Mich App 232, 244; 956 NW2d 544 (2020), lv den 507 Mich 1020 (2021). MCL 722.23 provides:

As used in this act, "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

-17-

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(l) Any other factor considered by the court to be relevant to a particular child custody dispute.

The dispute in this case is about legal custody rather than physical custody. Legal custody is governed by MCL 722.26a, which provides in relevant part:

(1) In custody disputes between parents, the parents shall be advised of joint custody. At the request of either parent, the court shall consider an award of joint custody, and shall state on the record the reasons for granting or denying a request. In other cases joint custody may be considered by the court. The court shall determine whether joint custody is in the best interest of the child by considering the following factors:

(a) The factors enumerated in section 3.

(b) Whether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child.

"If two equally capable parents . . . are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children." *Bofysil*, 332 Mich App at 249 (quotation marks and citation omitted).

Plaintiff-mother challenges the trial court's findings regarding factors (c), (i), (*l*), and MCL 722.26a(1)(b). With the exception of factor (i), we agree with plaintiff-mother.

Factor (c) is "[t]he capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). This factor is not

determined solely by who makes more money as long as each party has enough money to meet the child's needs. See *Berger v Berger*, 277 Mich App 700, 711; 747 NW2d 336 (2008). Regarding this factor, the trial court said that "both have the capacity and disposition to provide that, they both have good, stable jobs; PNC and GM. They both have good jobs. They're able to provide the food and clothing, medical care and things of that, so I would find this to be equal."

The court's finding was against the great weight of the evidence because the record overwhelmingly established that plaintiff-mother had a significantly greater disposition to provide the child with medical care. Multiple experts testified that it was important for a child to be promptly taken to the hospital upon expressing suicidal intent, but plaintiff-mother was the only person who ever took the child to the hospital. There were multiple instances in which medical providers were unable to get in touch with defendant-father while the child was receiving emergency care. Defendant-father refused to consent to plaintiff-mother's efforts to have a psychiatrist assess the child's need for depression and anxiety medication, insisting instead that this should be done by a general practitioner. Defendant-father also refused to consent to an intensive outpatient psychiatric program at the New Oakland facility that was recommended for the child. Defendant-father dismissed medical advice that came from clinical social workers, seemingly viewing them as unqualified, and insisted on only listening to clinical psychologists. Despite this insistence, defendant-father vetoed any consultation with practitioners employed by the University of Michigan, citing fears that they would have an "agenda." However, defendant-father failed to seek care from alternative practitioners. Regarding puberty blockers, defendant-father was dug-in on his opposition to it and was unwilling to view the evidence through an objective lens. The court was presented with unrebutted expert testimony that there was no evidence of long-term harm from puberty blockers, that they simply delayed puberty, and that natural puberty would progress normally if the child was taken off the puberty blockers. Defendant-father simply "disagreed" with these expert opinions, citing "common sense" as the basis for his belief that the child was too young to undergo any sort of a medical transition. Moreover, the evidence suggested that defendant-father lacked insight into the sources of the child's mental illness. As detailed above, the child repeatedly cited defendant-father's lack of acceptance as the root of the suicidal ideation, and the mental health crises routinely correlated with the child's impending departure for defendant-father's parenting time. Despite this, defendant-father was unwilling to concede the possibility that his actions contributed to the child's mental illness and insisted that something else must be underlying the problems. The only rational view of the evidence mandates a conclusion that this factor should weigh heavily in plaintiff-mother's favor.

Factor (i) is the reasonable preference of the child. Regarding this factor, the court said the following:

I met [the child] in Chambers, and talked to her briefly. I can't share that with you. I'll tell you it was a little—I was a little surprised how that went down, but the reasonable preference of [the child] will be taken into consideration. But that is confidential and I won't share that with you, but I can take that into consideration.

But I will tell you, Mom and Dad, I don't give that factor a huge preference there because it just doesn't seem fair that we don't put it on the record, but that's

-19-

how the law works, but the Court will consider that and give it the weight that I consider necessary.

Plaintiff-mother argues that the trial court erred by declining to give this factor greater weight due to fairness concerns.

It is true that the court is required to consider the child's preference if the child is old enough to express one. *Kubicki v Sharpe*, 306 Mich App 525, 545; 858 NW2d 57 (2014). However, the record suggests that the court satisfied this obligation, its comments regarding the fairness of this factor notwithstanding. The court explicitly stated that the child's preference would be taken into consideration and that it would be given as much weight as the court determined necessary. Therefore, we discern no error regarding factor (i).

"Factor *l* is a 'catch-all' provision." *McIntosh v McIntosh*, 282 Mich App 471, 482; 768 NW2d 325 (2009). The trial court correctly chose to consider the child's gender dysphoria, but this factor should have weighed heavily in favor of plaintiff-mother. Testimony from multiple experts established the most effective approaches that parents should take when raising transgender children in order to facilitate positive mental health outcomes. Defendant-father's own testimony, in conjunction with the documentation from the child's numerous hospitalizations, established that defendant-father was unwilling to approach the child's welfare in conformance with expert advice. Clinton and Kessler each testified that it was in the best interests of the child to use the child's preferred name and pronouns and, more generally, to affirm the child's gender identity. Indeed, Kessler described a parent's failure to accept a transgender child as "a global rejection" that causes the child to feel entirely unworthy. This testimony was unrebutted. Despite this, defendant-father was unwilling to use the child's female name and pronouns. Indeed, even the court decided to respect the child's wishes in this regard, but defendant-father made it clear that he was not willing to budge. He suggested that he might reconsider at an undefined point in the future, but he was noncommittal about this as well. Defendant-father likewise had a rule that the child needed to wear masculine clothes when at defendant-father's house. The court asked defendant-father about his unwillingness to affirm the child's gender identity, and he suggested that it was best that the child be given an "alternate path." Defendant acknowledged that this approach was contrary to the recommendations of the experts, but he disagreed with their opinions, describing them as "subjective."

Defendant-father made numerous assertions that were directly contrary to the expert testimony. Defendant-father insisted that the child was too young to decide to wear feminine clothing, choose a different name, and use she/her pronouns. Defendant-father, a layperson in these matters, offered opinions regarding the cognitive abilities of young children to support his approach. However, this testimony came immediately after multiple experts extensively addressed the child's age. Both experts explained that it was very common for a nonconforming gender identity to manifest at a very young age, perhaps as young as when the child first becomes verbal. Kessler specifically testified regarding brain development, stating that certain facets of brain development are completed at a very young age and that components involving critical thinking and impulse control develop later in life. Defendant-father expressed concern regarding irreversible damage that was not founded in expert opinions. The evidence suggested it was very unlikely that the child would later come to identify as male and that, if this did happen, support could be offered to help transition back. There also was no evidence of long-term harm arising

from puberty blockers. Rather, the evidence presented suggests that puberty blockers would afford the child an additional one to three years to determine the child's preferred path regarding puberty, and this would align with defendant-father's preference to wait until the child is older to allow such changes to take place. Finally, defendant-father's insistence on treating the child as a boy was directly against all expert advice offered at any point in this proceeding, and defendant-father has not offered any support for this approach aside from his own opinion.

Legal custody disputes require the added consideration of the ability of the parents to agree regarding "important decisions affecting the welfare of the child." MCL 722.26a(1)(b). The evidence irrefutably established that the parties were incapable of agreeing with respect to hormonal medicate and psychiatric care. Indeed, defendant-father expressly admitted that it was impossible for him and plaintiff-mother to agree regarding the approach to the child's gender dysphoria. Thus far, the parties have not been able to agree with respect to puberty blockers, psychiatric medication, and psychological care providers. The record makes clear that issues such as these will inevitably arise on a regular basis until the child attains the age of majority. On this record, the court's instruction that the parties must simply attempt to find "a middle ground" was indefensible. The court had no choice but to grant sole legal custody to one of the parties and to do so in the best interests of the child. See *Bofysil*, 332 Mich App at 249. The only conclusion supported by the evidence is that plaintiff-mother was substantially better equipped to make important decisions in the best interests of the child.

Therefore, we conclude that the trial court abused its discretion by denying plaintiff-mother's motion for sole legal custody.

## C. PARENTING TIME

The trial court abused its discretion by denying plaintiff-mother's request to place restrictions on defendant-father's parenting time.

Parenting time in Michigan is governed by MCL 722.27a, which provides in relevant part:

> (1) Parenting time shall be granted in accordance with the best interests of the child. It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents. Except as otherwise provided in this section, parenting time shall be granted to a parent in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time.

> \* \* \*

> (7) The court may consider the following factors when determining the frequency, duration, and type of parenting time to be granted:

> (a) The existence of any special circumstances or needs of the child.

> (b) Whether the child is a nursing child less than 6 months of age, or less than 1 year of age if the child receives substantial nutrition through nursing.

-21-

(c) The reasonable likelihood of abuse or neglect of the child during parenting time.

(d) The reasonable likelihood of abuse of a parent resulting from the exercise of parenting time.

(e) The inconvenience to, and burdensome impact or effect on, the child of traveling for purposes of parenting time.

(f) Whether a parent can reasonably be expected to exercise parenting time in accordance with the court order.

(g) Whether a parent has frequently failed to exercise reasonable parenting time.

(h) The threatened or actual detention of the child with the intent to retain or conceal the child from the other parent or from a third person who has legal custody. A custodial parent's temporary residence with the child in a domestic violence shelter shall not be construed as evidence of the custodial parent's intent to retain or conceal the child from the other parent.

(i) Any other relevant factors.

The trial court did not explicitly address the parenting time factors laid out in MCL 722.27a(7), but it was not required to do so as long as its decision was guided by the child's best interests. See *Shade v Wright*, 291 Mich App 17, 32; 805 NW2d 1 (2010). Regardless, the parties and court agreed that the dispute in this matter revolved entirely around management of the child's gender dysphoria.

The only conclusion that can be reasonably supported by this record is that parenting time with defendant-father was actively harming the child. Both expert witnesses testified that it was harmful to the child when defendant-father refused to respect the child's female identify. Clinton testified that the child "expressed a lot of distress" when defendant-father required the use of masculine clothing and that a parent's refusal to use a child's preferred name and pronouns increased the risk of suicidal ideation. Kessler described it as "very important" that parents use the child's chosen name, use the child's preferred pronouns, and allow the child to wear clothing and partake in activities that affirm the child's gender identity. During the progression of the child's mental illness, each set of prospective recommendations endorsed steps to affirm the child's gender identity. Defendant-father unequivocally and unapologetically refused to do any of this during his parenting time, explaining that he crafted a rule that the child must dress and act as a boy when at his house and expressing no openness to easing this rule. The court seemingly endorsed the approach advocated for by these experts by using the child's female name and pronouns and by suggesting, but not ordering, that defendant-father should open his mind and recognize "the big picture."

The evidence also makes clear that defendant-father's approach to his parenting time has already caused the mental anguish of which Clinton and Kessler warned. Each of the child's emergency room visits came on the eve of defendant-father's parenting time, and the child

repeatedly expressed a preference for death over participating in defendant-father's parenting time. At one point, the child expressed fear that it would be impossible to remain safe from suicidal actions during an impending weekend stay with defendant-father. The evidence that each hospitalization came with reports of fears of committing suicide at defendant-father's home was unrebutted and even acknowledged by defendant-father. There was no evidence suggesting that the child was being inauthentic, and the trial court's finding that plaintiff-mother was not facilitating these problems was supported by the evidence. What was not supported by the evidence was its decision to maintain the status quo.

While the trial court erred by leaving defendant-father's parenting time without any restrictions, the evidence did support its decision to deny plaintiff-mother's request to outright suspend his parenting time. The evidence suggested that defendant-father loved the child dearly. There was no indication that defendant-father was physically abusing the child or failing to meet the child's physical needs. There likewise was no indication that defendant-father had a habit of explicitly disparaging the child's feminine inclinations.[4] Moreover, defendant-father indicated that he would not exercise parenting time against the child's will.[5] However, as an alternative to outright suspension, plaintiff-mother advocated for restrictions on defendant-father's parenting time.

Simply put, the trial court's decision to allow defendant-father's parenting time to remain wholly unchanged, on this record, was indefensible. Unless defendant-father brings a new motion supported by expert testimony that it is in the child's best interests, defendant-father must be barred from ignoring the advice of medical professionals outlined on the record which include using the child's masculine name, referring to the child using male pronouns, forcing the child to wear masculine clothes, and cutting the child's hair.

## III. CONCLUSION

The trial court's July 28, 2023 order is reversed. Plaintiff-mother shall have full legal custody of the minor child. Plaintiff-father shall not refer to the child using a masculine name and masculine pronouns while in the child's presence. Plaintiff-father likewise shall not require that the child wear masculine clothing, cut the child's hair, or restrict the child's access to activities based only on his perception of the activities as feminine. These provisions of this opinion shall have immediate effect pursuant to MCR 7.215(F)(2). The methods employed to ensure defendant-father's compliance with the parenting time restrictions as well as any corresponding changes to the frequency and duration of defendant-father's parenting time shall be left to the trial court's discretion.

---

[4] There was evidence that at some point in time defendant-father referred to the child as "twinkle toes" while dancing at defendant-father's house. There likewise were concerns at times that defendant-father would play transphobic music at his house. However, on balance, the evidence supported a finding that this was not an ongoing source of concern.

[5] We note that defendant-father at one point suggested an arrangement that he exercise parenting time at the discretion of the child, but it clearly is not in the best interests of an 11-year-old child to be charged with constructing and enforcing a parenting time schedule.

We reverse.  This case is remanded for additional proceedings consistent with this opinion. Plaintiff-mother, being the prevailing party, may tax costs.  See MCR 7.219(A).  We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Allie Greenleaf Maldonado